# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5564 | **DATE** | 10/26/2000 |
| **CASE TITLE** | MAHURKAR vs. C.R. BARD, INC. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)    ☐ General Rule 21    ☐ FRCP41(a)(1)    ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    **Motion (10-1) for summary judgment on Count 1 is granted.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | NOV 2 0 2000 | 20 |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 00 NOV 20 AM 9: 50 | | |
| DW | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice / mailing deputy initials | |

DOCKETED

NOV 20 2000

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DR. SAKHARAM D. MAHURKAR,

              Plaintiff,

    v.

C.R. BARD, INC.,

              Defendant.

No. 99 C 5564
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

The hunt for a smoking gun document is about as exciting as commercial litigation gets. In this case, something happened to a piece of paper – perhaps it was put in an envelope and given to plaintiff's attorney's messenger, or perhaps it was put in a file and never tendered. This was in 1996 and the trail is cold, memories are stale. Millions of dollars are at stake, and the question is whether Dr. Mahurkar has a triable case. Defendant thinks not and moves for summary judgment on Count I of plaintiff's complaint. Fed. R. Civ. P. 56(c).[1]

Dr. Mahurkar is the inventor of a dual lumen catheter, U.S. Patent No. 4,808,155 (the '155 patent). On May 9, 1990, Mahurkar licensed his patent to C.R. Bard for the non-exclusive right to make, use or sell dual lumen catheters designed and intended for use solely in non-hemodialysis intravenous applications, referred to in this case as Hohn catheters. In Count I of his complaint, Mahurkar alleges that Bard's sale of Hohn catheters infringes his patent because he terminated the 1990 license agreement in 1996 -- any continued use of the patent constitutes infringement. Bard

---

[1]     Summary judgment is appropriate if there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law. I interpret the facts in the light most favorable to the non-movant, Dr. Mahurkar. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986).

argues that Mahurkar never rightfully terminated the license; the license remains valid and therefore is a complete defense to infringement. *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927).

Resolution of this infringement claim thus requires an analysis of the events surrounding Mahurkar's termination letter. The license agreement requires Bard to send Mahurkar a quarterly report showing the quantity of Hohn catheters subject to a royalty along with a royalty check. Because the parties were litigating many issues related to the '155 patent, *see e.g., Mahurkar v. C.R. Bard, Inc.*, 1993 WL 259446 * 1 (N.D. Ill. 1993), they reasonably decided to communicate through their lawyers. Bard would send the royalty report (a one-page document) and check to its lawyers at Winston & Strawn, who in turn would pass the report and check on to Mahurkar's lawyers.

Paragraph V(B) of the licensing agreement states in relevant part:

> [V(B.)]     [Mahurkar] may terminate this Agreement upon written notice to [Bard], if:
> 2.     [Bard] shall remain in default of any payment or report required hereunder or fail to comply with any other provision of this Agreement for period of more than thirty (30) days after written notice specifying such default or failure is given [Bard] by [Mahurkar].
> [...]
> In the event [Bard] cures any default within the thirty (30) day time period set forth above, the subject Agreement shall not be terminated and shall remain in full force and effect.

This case concerns the third-quarter 1996 report and royalty check. Bard prepared the report and check as required by the Agreement and sent it to its lawyer, Terry Grimm at Winston & Strawn. This was around October 29, 1996 and Grimm was not in his office when the package arrived by UPS Next Day Air. Following her usual procedure, Susan Urso, Grimm's secretary, opened his mail and noticed the cover letter, royalty report and check. What happened next is a matter of some dispute, but for now, I describe the events from Urso's point of view. Urso says she placed the entire

package (cover letter, report and check) in Winston & Strawn's vault. Urso then forgot about it and failed to tell Grimm that she received a package from the client.

Dr. Mahurkar noticed that his third quarter report and check were late. Pursuant to the Agreement, on November 14, 1996, he sent Bard a written notice informing it that it was in default of the licensing agreement for failure to tender a report and check. As stated in Paragraph V(B), this triggered a thirty day period within which Bard could cure the problem and avoid termination of the Agreement. Bard's assistant general counsel, William Reilly, sent a fax to Grimm asking him to take care of the situation. The fax, sent on November 19, 1996, included copies of the original October 29, 1996 cover letter, royalty report and check.

Grimm received the fax and asked his secretary if she knew anything about the October 29 package. At her deposition, Urso testified that her heart sank when she realized she had made a mistake, and she told Grimm that she placed the package in the vault. Grimm says he told her to get the package out of the vault and get it to Mahurkar's lawyer right away. At the time, Steve Rudisill from Arnold, White & Durkee represented Mahurkar. Grimm told Urso to remove the cover letter (the October 29 letter by client Reilly to attorney Grimm) from the package. Either Grimm or Urso called Rudisill's office and informed someone there that Winston & Strawn had something to be picked up for Dr. Mahurkar. Urso says she placed the report and check in an envelope and that a messenger came to her desk and picked it up.

Bard admits it was in default since it was late with the report and check, but argues it cured the default within thirty days when Urso gave the messenger the report and check in an envelope. According to Mahurkar, he received a call from Rudisill on November 19 informing him that his royalty check was in hand. Mahurkar went to Rudisill's office and received the check – no envelope,

3

and most importantly, no report. Rudisill no longer recalls receiving an envelope or precisely how he delivered the check to his client. Around November 25, Mahurkar cashed the check and on December 19, sent Bard a letter terminating the license agreement for failure to cure the default. He says Bard failed to cure the default since he did not receive the report within thirty days of his November 14 written notice.

Only Urso, the messenger and Rudisill ever had personal knowledge of what was transmitted from Winston & Strawn to Arnold, White & Durkee. Today, Urso is unequivocal – she gave the messenger the report. Rudisill does not remember, and the messenger is unidentified. Bard therefore says that it cannot be disputed that Urso tendered the report. Mahurkar does not dispute that if Urso gave the messenger the report, then Bard cured the default, termination was improper, and the license is a valid defense to infringement.[2]

Although he admits he has no personal knowledge of what Urso gave the messenger, Mahurkar says he has evidence that proves Urso is wrong. First, there is Reilly's October 29 cover letter. It instructs Grimm to tender the royalties to Mahurkar immediately, it doesn't mention the report. Next, there is Urso's log entry in the Winston & Strawn vault. The log refers only to a check being placed and retrieved from the vault. Then there is a "Note to File" produced by Winston & Strawn. The note, which does not indicate any authorship, states:

> Upon receipt of the check in the amount of $40,443,13 [sic], my secretary Sue Urso placed the check in our vault at Winston & Strawn. When Mr. Reilly called to ask us to forward the

---

[2] Mahurkar does not explicitly make this concession, but it is one that I infer from his argument. He makes brief reference to the fact that he sent a letter to Bard asking it to send all license-related correspondence to him directly (the same letter notified Bard that Mahurkar had fired his then-attorney Raymond Niro). However, since Mahurkar does concede that Bard cured the default with respect to the check, I assume Mahurkar would concede that if Urso gave the report to the messenger, that default would also be cured.

check to Mahurkar's attorney, Sue got the check out of the vault on November 19, 1996 and the check was picked up.

Finally, there is the absence of a copy of the check in Winston & Strawn's file. The firm produced copies of the October 29 cover letter with the report attached, but not the check. This, Mahurkar suggests, means that the report and check were not kept together.

There is more, says Mahurkar. After the termination letter, Bard never represented to Mahurkar that it sent the report. Instead, Grimm sent Rudisill a letter on January 6, 1997 saying Mahurkar must be mistaken, Bard's records show he cashed the check, so the default must have been cured. Then, on January 27, 1997, Bard (again through Winston & Strawn) tendered only the fourth-quarter check to Mahurkar. Bard did not tender the fourth-quarter report until a few days later on February 4, 1997. Mahurkar gathers all this evidence to suggest that Bard and Winston & Strawn never thought the report was as important as the check.

Bard has a response to this. First, Urso testified that she understood the term "royalties" as used in Reilly's October 29 cover letter to mean both the report and check. Next, Urso testified that when she used the term "check" in filling out the vault log, she meant cover letter, report and check; she used "check" as a short description to remind her of the materials, not to exhaustively list everything placed in the vault. Similarly, Bard says the "Note to File" was not meant to recite all the facts surrounding the transmittal of the third quarter report and check. The absence of a copy of the check in Winston & Strawn's files does not mean anything, says Bard, since Mahurkar failed to ask Urso if she made a copy of the check and report at any time. As for the fourth-quarter report, Bard says it sent it to Mahurkar as soon as the document was ready, which for the fourth quarter was a few days after the check was ready. Bard admits that Grimm's January 6, 1997 letter does not

5

mention the report, but says that, like the vault log and note to file, it should not be read as

necessarily excluding the report.[3]

This battle over Urso's testimony and Mahurkar's circumstantial evidence seems at first

glance to be a battle over evidentiary weight. Bard says it tendered the report, Mahurkar says it

didn't. Bard has Urso's direct evidence (her unequivocal personal knowledge), and Mahurkar has

inferences to be drawn by negative implication from various documents. As I have instructed jurors

time and time again, the law recognizes no distinction between direct and circumstantial evidence;

evidence is evidence. However, Bard says that Mahurkar is not providing evidence, but only

attacking Urso's credibility, which is insufficient to defeat summary judgment. *Dugan v. Smerwick

Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998); *Giannopolous v. Brach & Brock Confections, Inc.*,

109 F.3d 406, 411 (7th Cir. 1997).

Bard is correct. Mahurkar wants a trial so that he may argue the implausibility of Urso's

testimony, but "[i]nferences and opinions must be grounded on more than ... speculations, hunches

[or] intuitions." *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). Urso explained

that in her mind "check" or "royalties" included the report, so Mahurkar is left with merely a hunch

that Urso is incredible. This case boils down to what Urso gave the messenger (not what was in the

---

[3]     There is one more piece of evidence relied upon by Mahurkar. On February 15, 1997, Rudisill, Mahurkar's lawyer, sent a letter to Grimm which states, "Bard to this day has never tendered the required report to [Mahurkar]." Bard objects to this letter as inadmissible hearsay. The letter is clearly an unsworn statement offered for the truth of the matter asserted, and hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial. Fed. R. Evid. 802; *Eisenstadt v. Centel Corporation*, 113 F.3d 738, 742 (7th Cir. 1997). Often, hearsay will be considered at summary judgment if some showing is made that the evidence will be replaced by admissible testimony at trial. *Eisenstadt*, 113 F.3d at 742. Mahurkar has made no such showing (Rudisill's deposition reveals he has no recollection of these events), nor has Mahurkar argued for admission of the contents of the letter as a recorded recollection. Fed. R. Evid. 803(5). Moreover, Rudisill's statement in the letter does not appear to be based on personal knowledge, but instead is based on his interpretation of previous correspondence by others. I disregard the letter.

vault or what Reilly told Grimm), and on that point there is only Urso's testimony. There are no inferences to be drawn from Urso's testimony concerning the envelope given to the messenger -- she is unequivocal. Documentary evidence from which one could infer that Reilly or Grimm placed less importance on the report than the check, or that only the check was in the vault, does not impact Urso's testimony, since Urso says she understood her task to be to send both report and check to Mahurkar's counsel. Obviously, it is not within my province to weigh the evidence, but I must decide if Mahurkar has enough to go to trial. He does not.

I disagree with Mahurkar's characterization of the evidence. The documents do not establish that the report was not given to the messenger, at most they suggest that Reilly and Grimm were only concerned with the check. This does not conflict with Urso's testimony that she gave both the report and the check to the messenger. To get where Mahurkar wants to go, one must impeach Urso by suggesting an inference upon inference -- that Reilly and Grimm only cared about the check (an inference), and that Urso, contrary to her testimony, felt the same way when she prepared the envelope for the messenger (an inference based on no evidence in this record).

Since Mahurkar agrees that if Urso gave the messenger the report, then the default was cured, and since there is no contrary evidence as to the transaction between Urso and the messenger, I find that defendant is entitled to summary judgment on Count I.[4]

---

[4]    I need not reach Bard's alternative argument, however, I comment on it for the sake of completeness. Bard says that Paragraph V(B)'s termination provision, which gives Mahurkar the right to terminate if Bard fails to cure "any" default within thirty days, means that it need cure only one default. If it is in default for failure to tender both the report and check, it may cure by sending the check. Mahurkar must send another letter putting Bard on notice a second time (this time for the report only), thus giving Bard another thirty days to cure before termination is allowed. This is a lexically permissible but unreasonable reading of the contract. To read "any" to mean "either" would impose an obligation to send duplicative notices and create a wasteful incentive to delay on the part of Bard. To read "any" to mean "any and all" eliminates this problem, while being well within the bounds of everyday language, and would be the interpretation I would give to the contract.

## CONCLUSION

The motion for summary judgment [10-1] on Count I is granted.

ENTER:

_James B. Zagel_
James B. Zagel
United States District Judge

DATE: _26 OCTOBER 2000_

8